(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FACEBOOK, INC. *v.* DUGUID ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–511.   Argued December 8, 2020—Decided April 1, 2021

The Telephone Consumer Protection Act of 1991 (TCPA) proscribes abusive telemarketing practices by, among other things, restricting certain communications made with an "automatic telephone dialing system." The TCPA defines such "autodialers" as equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers. 47 U. S. C. §227(a)(1). Petitioner Facebook, Inc., maintains a social media platform that, as a security feature, allows users to elect to receive text messages when someone attempts to log in to the user's account from a new device or browser. Facebook sent such texts to Noah Duguid, alerting him to login activity on a Facebook account linked to his telephone number, but Duguid never created that account (or any account on Facebook). Duguid tried without success to stop the unwanted messages, and eventually brought a putative class action against Facebook. He alleged that Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages. Facebook countered that the TCPA does not apply because the technology it used to text Duguid did not use a "random or sequential number generator." The Ninth Circuit disagreed, holding that §227(a)(1) applies to a notification system like Facebook's that has the capacity to dial automatically stored numbers.

*Held*: To qualify as an "automatic telephone dialing system" under the TCPA, a device must have the capacity either to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator. Pp. 4–12.

Syllabus

(a) This case turns on whether the clause "using a random or sequential number generator" in §227(a)(1)(A) modifies both of the two verbs that precede it ("store" and "produce"), as Facebook contends, or only the closest one ("produce"), as maintained by Duguid. The most natural reading of the text and other aspects of §227(a)(1)(A) confirm Facebook's view. First, in an ordinary case, the "series-qualifier canon" instructs that a modifier at the end of a series of nouns or verbs applies to the entire series. Here, that canon indicates that the modifying phrase "using a random or sequential number generator" qualifies both antecedent verbs, "store" and "produce." Second, the modifying phrase immediately follows a concise, integrated clause ("store or produce telephone numbers to be called"), which uses the word "or" to connect two verbs that share a common direct object ("telephone numbers to be called"). Given this structure, it would be odd to apply the modifier to just one part of the cohesive clause. Third, the comma in §227(a)(1)(A) separating the modifying phrase from the antecedents suggests that the qualifier applies to all of the antecedents, instead of just the nearest one. Pp. 4–6.

Duguid's insistence that a limiting clause should ordinarily be read as modifying only the phrase that it immediately follows (the so-called "rule of the last antecedent") does not help his cause for two reasons. First, the Court has declined to apply that rule in the specific context where, as here, the modifying clause appears after an integrated list. *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4. Second, the last antecedent before the clause at issue in §227(a)(1)(A) is not "produce," as Duguid argues, but rather "telephone numbers to be called." Pp. 6–7.

(b) The statutory context confirms that the TCPA's autodialer definition excludes equipment that does not use a random or sequential number generator. Congress found autodialer technology harmful because autodialers can dial emergency lines randomly or tie up all of the sequentially numbered phone lines at a single entity. Facebook's interpretation of §227(a)(1)(A) better matches the scope of the TCPA to these specific concerns. Duguid's interpretation, on the other hand, would encompass any equipment that stores and dials telephone numbers. Pp. 7–8.

(c) Duguid's other counterarguments do not overcome the clear commands of the statute's text and broader context. First, he claims that his interpretation best accords with the "sense" of the text. It would make little sense however, to classify as autodialers all equipment with the capacity to store and dial telephone numbers, including virtually all modern cell phones. Second, Duguid invokes the "distributive canon," which provides that a series of antecedents and consequents should be distributed to one another based on how they most

Syllabus

naturally relate in context. But that canon is less suited here because there is only one consequent to match to two antecedents, and in any event, the modifying phrase naturally relates to both antecedents. Third, Duguid broadly construes the TCPA's privacy-protection goals. But despite Congress' general concern about intrusive telemarketing practices, Congress ultimately chose a precise autodialer definition. Finally, Duguid argues that a random or sequential number generator is a "senescent technology," *i.e.,* one likely to become outdated quickly. That may or may not be the case, but either way, this Court cannot rewrite the TCPA to update it for modern technology. Congress' chosen definition of an autodialer requires that the equipment in question must use a random or sequential number generator. That definition excludes equipment like Facebook's login notification system, which does not use such technology. Pp. 8–11.

926 F. 3d 1146, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. ALITO, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 19–511

FACEBOOK, INC., PETITIONER *v.*
NOAH DUGUID, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 1, 2021]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Telephone Consumer Protection Act of 1991 (TCPA) proscribes abusive telemarketing practices by, among other things, imposing restrictions on making calls with an "automatic telephone dialing system." As defined by the TCPA, an "automatic telephone dialing system" is a piece of equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers. 47 U. S. C. §227(a)(1). The question before the Court is whether that definition encompasses equipment that can "store" and dial telephone numbers, even if the device does not "us[e] a random or sequential number generator." It does not. To qualify as an "automatic telephone dialing system," a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator.

### I

### A

In 1991, Congress passed the TCPA to address "the pro-liferation of intrusive, nuisance calls" to consumers and businesses from telemarketers. §2, ¶¶1, 6, 105 Stat. 2394, note following 47 U. S. C. §227. Advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts. Infa-mously, the development of "robocall" technology allowed companies to make calls using artificial or prerecorded voices, obviating the need for live human callers altogether.

This case concerns "automatic telephone dialing systems" (hereinafter autodialers), which revolutionized telemarket-ing by allowing companies to dial random or sequential blocks of telephone numbers automatically. Congress found autodialer technology to be uniquely harmful. It threatened public safety by "seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services." H. R. Rep. No. 102–317, p. 24 (1991). Indeed, due to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines. Nor were individual consumers spared: Auto-dialers could reach cell phones, pagers, and unlisted num-bers, inconveniencing consumers and imposing unwanted fees.[1] *Ibid.*

Against this technological backdrop, Congress made it unlawful to make certain calls "using any automatic tele-phone dialing system" to "emergency telephone line[s]," to

---

[1] At the time Congress enacted the TCPA, most cellular providers charged users not only for outgoing calls but also for incoming calls. See *In re Rules and Regulations Implementing Telephone Consumer Protec-tion Act of 1991*, 18 FCC Rcd. 14014, 14115 (2003).

"guest room[s] or patient room[s] of a hospital," or "to any telephone number assigned to a paging service [or] cellular telephone service" without the "prior express consent of the called party." 47 U. S. C. §227(b)(1)(A).[2] The TCPA creates a private right of action for persons to sue to enjoin unlawful uses of autodialers and to recover up to $1,500 per violation or three times the plaintiffs' actual monetary losses. §227(b)(3).

## B

Petitioner Facebook, Inc., maintains a social media platform with an optional security feature that sends users "login notification" text messages when an attempt is made to access their Facebook account from an unknown device or browser. If necessary, the user can then log into Facebook and take action to secure the account. To opt in to this service, the user must provide and verify a cell phone number to which Facebook can send messages.

In 2014, respondent Noah Duguid received several login-notification text messages from Facebook, alerting him that someone had attempted to access the Facebook account associated with his phone number from an unknown browser. But Duguid has never had a Facebook account and never gave Facebook his phone number.[3] Unable to stop the notifications, Duguid brought a putative class action against Facebook. He alleged that Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser.

—————

[2] Neither party disputes that the TCPA's prohibition also extends to sending unsolicited text messages. See *Campbell-Ewald Co.* v. *Gomez*, 577 U. S. 153, 156 (2016). We therefore assume that it does without considering or resolving that issue.

[3] As Facebook explains, it is possible that Duguid was assigned a recycled cell phone number that previously belonged to a Facebook user who opted to receive login notifications.

Facebook moved to dismiss the suit, arguing primarily that Duguid failed to allege that Facebook used an autodialer because he did not claim Facebook sent text messages to numbers that were randomly or sequentially generated. Rather, Facebook argued, Duguid alleged that Facebook sent targeted, individualized texts to numbers linked to specific accounts. The U. S. District Court for the Northern District of California agreed and dismissed Duguid's amended complaint with prejudice. 2017 WL 635117, *4–*5 (Feb. 16, 2017).

The United States Court of Appeals for the Ninth Circuit reversed. As relevant here, the Ninth Circuit held that Duguid had stated a claim under the TCPA by alleging that Facebook's notification system automatically dialed stored numbers. An autodialer, the Court of Appeals held, need not be able to use a random or sequential generator to store numbers; it need only have the capacity to "'store numbers to be called'" and "'to dial such numbers automatically.'" 926 F. 3d 1146, 1151 (2019) (quoting *Marks* v. *Crunch San Diego, LLC*, 904 F. 3d 1041, 1053 (CA9 2018)).

We granted certiorari to resolve a conflict among the Courts of Appeals regarding whether an autodialer must have the capacity to generate random or sequential phone numbers.[4] 591 U. S. ___ (2020). We now reverse the Ninth Circuit's judgment.

## II

Section 227(a)(1) defines an autodialer as:

"equipment which has the capacity—

───────────

[4] Compare 926 F. 3d 1146, 1151–1152 (CA9 2019); *Duran* v. *La Boom Disco, Inc.*, 955 F. 3d 279, 290 (CA2 2020); and *Allan* v. *Pennsylvania Higher Educ. Assistance Agency*, 968 F. 3d 567, 579–580 (CA6 2020), with *Gadelhak* v. *AT&T Servs., Inc.*, 950 F. 3d 458, 468 (CA7 2020) (Barrett, J., for the court); *Glasser* v. *Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1306–1307 (CA11 2020); and *Dominguez* v. *Yahoo, Inc.*, 894 F. 3d 116, 119 (CA3 2018).

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
"(B) to dial such numbers."

Facebook argues the clause "using a random or sequential number generator" modifies both verbs that precede it ("store" and "produce"), while Duguid contends it modifies only the closest one ("produce"). We conclude that the clause modifies both, specifying how the equipment must either "store" or "produce" telephone numbers. Because Facebook's notification system neither stores nor produces numbers "using a random or sequential number generator," it is not an autodialer.

A

We begin with the text. Congress defined an autodialer in terms of what it must do ("store or produce telephone numbers to be called") and how it must do it ("using a random or sequential number generator"). The definition uses a familiar structure: a list of verbs followed by a modifying clause. Under conventional rules of grammar, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (Scalia & Garner) (quotation modified). The Court often applies this interpretative rule, usually referred to as the "series-qualifier canon." See *Paroline* v. *United States*, 572 U. S. 434, 447 (2014) (citing *Porto Rico Railway, Light & Power Co.* v. *Mor*, 253 U. S. 345, 348 (1920)); see also *United States* v. *Bass*, 404 U. S. 336, 339–340 (1971). This canon generally reflects the most natural reading of a sentence. Imagine if a teacher announced that "students must not complete or check any homework to be turned in for a grade, using online homework-help websites." It would be strange to read that rule as prohibiting

students from completing homework altogether, with or without online support.

Here, the series-qualifier canon recommends qualifying both antecedent verbs, "store" and "produce," with the phrase "using a random or sequential number generator." That recommendation produces the most natural construction, as confirmed by other aspects of §227(a)(1)(A)'s text.

To begin, the modifier at issue immediately follows a concise, integrated clause: "store or produce telephone numbers to be called." See *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 21–22). The clause "hangs together as a unified whole," *id.,* at \_\_\_ (slip op., at 21), using the word "or" to connect two verbs that share a common direct object, "telephone numbers to be called." It would be odd to apply the modifier ("using a random or sequential number generator") to only a portion of this cohesive preceding clause.

This interpretation of §227(a)(1)(A) also "heed[s] the commands of its punctuation." *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 454 (1993). Recall that the phrase "using a random or sequential number generator" follows a comma placed after the phrase "store or produce telephone numbers to be called." As several leading treatises explain, "'[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'" W. Eskridge, Interpreting Law: A Primer on How To Read Statutes and the Constitution 67–68 (2016); see also 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction §47:33, pp. 499–500 (rev. 7th ed. 2014); Scalia & Garner 161–162. The comma in §227(a)(1)(A) thus further suggests that Congress intended the phrase "using a random or sequential number generator" to apply equally to both preceding elements.

Contrary to Duguid's view, this interpretation does not

conflict with the so-called "rule of the last antecedent." Under that rule, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003); see also *Lockhart* v. *United States*, 577 U. S. 347, 351 (2016). The rule of the last antecedent is context dependent. This Court has declined to apply the rule where, like here, the modifying clause appears after an integrated list. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4 (2005) (collecting cases). Moreover, even if the rule of the last antecedent were relevant here, it would provide no help to Duguid. The last antecedent before "using a random or sequential number generator" is not "produce," as Duguid needs it to be, but rather "telephone numbers to be called." There is "no grammatical basis," *Cyan*, 583 U. S., at ___ (slip op., at 22), for arbitrarily stretching the modifier back to include "produce," but not so far back as to include "store."

In sum, Congress' definition of an autodialer requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator. This definition excludes equipment like Facebook's login notification system, which does not use such technology.[5]

—————

[5] JUSTICE ALITO notes that he "agree[s] with much of the Court's analysis," as well as its ultimate conclusion about the interpretive question before us, yet he concurs in the judgment only. *Post,* at 1. His apprehension appears to stem from what he sees as the Court's "heavy reliance" on the series-qualifier canon. *Ibid.* Such canons, he argues, are "not inflexible rules." *Post,* at 4. On that point, we agree: Linguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue. That may be all JUSTICE ALITO seeks to prove with his discussion and list of "sentences that clearly go against the canon," *post,* at 3. (That the grammatical structure of every example he provides is materially dissimilar from that of the clause at issue in this case proves the point.) But to the extent that he

B

The statutory context confirms that the autodialer definition excludes equipment that does not "us[e] a random or sequential number generator." 47 U. S. C. §227(a)(1)(A). Consider the TCPA's restrictions on the use of autodialers. As previously noted, §227(b)(1) makes it unlawful to use an autodialer to call certain "emergency telephone line[s]" and lines "for which the called party is charged for the call." §227(b)(1)(A). It also makes it unlawful to use an autodialer "in such a way that two or more telephone lines of a multiline business are engaged simultaneously." §227(b)(1)(D). These prohibitions target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity.

Expanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel. Duguid's interpretation of an autodialer would capture virtually all modern cell phones, which have the capacity to "store . . . telephone numbers to be called" and "dial such numbers." §227(a)(1). The TCPA's liability provisions, then, could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses. See §227(b)(3) (authorizing a $500 fine per violation, increased to $1,500 if the sender acted "willfully" or

––––––––––

suggests that such canons have no role to play in statutory interpretation, or that resolving difficult interpretive questions is a simple matter of applying the "common understanding" of those "familiar with the English language," *post,* at 2–3, we disagree. Difficult ambiguities in statutory text will inevitably arise, despite the best efforts of legislators writing in "English prose," *post,* at 4. Courts should approach these interpretive problems methodically, using traditional tools of statutory interpretation, in order to confirm their assumptions about the "common understanding" of words.

"knowingly").[6]

### III

Duguid's counterarguments cannot overcome the clear commands of §227(a)(1)(A)'s text and the statutory context. The crux of Duguid's argument is that the autodialer definition calls for a construction that accords with the "sense" of the text. Brief for Respondents 11, and n. 3. It makes the most "sense," Duguid insists, to apply the phrase "using a random or sequential number generator" to modify only "produce," which, unlike the verb "store," is closely connected to the noun "generator." Dictionary definitions of "generator," for instance, regularly include the word "produce," which carries a very different meaning than "store." Duguid also claims that, at the time of the TCPA's enactment, the technical meaning of a "random number generator" invoked ways of producing numbers, not means of storing them.

Perhaps Duguid's interpretive approach would have some appeal if applying the traditional tools of interpretation led to a "linguistically impossible" or contextually implausible outcome. *Encino Motorcars, LLC* v. *Navarro*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 8); see also *Advocate Health Care Network* v. *Stapleton*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 11) (noting that a "sense of inconceivability" might "urg[e] readers to discard usual rules of interpreting text"). Duguid makes a valiant effort to prove as much, but ulti-

---

[6] Duguid contends that ordinary cell phones are not autodialers under his interpretation because they cannot dial phone numbers automatically and instead rely on human intervention. But all devices require some human intervention, whether it takes the form of programming a cell phone to respond automatically to texts received while in "do not disturb" mode or commanding a computer program to produce and dial phone numbers at random. We decline to interpret the TCPA as requiring such a difficult line-drawing exercise around how much automation is too much.

mately comes up short. It is true that, as a matter of ordinary parlance, it is odd to say that a piece of equipment "stores" numbers using a random number "generator." But it is less odd as a technical matter. Indeed, as early as 1988, the U. S. Patent and Trademark Office issued patents for devices that used a random number generator to store numbers to be called later (as opposed to using a number generator for immediate dialing).[7] Brief for Professional Association for Customer Engagement et al. as *Amici Curiae* 15–21. At any rate, Duguid's interpretation is contrary to the ordinary reading of the text and, by classifying almost all modern cell phones as autodialers, would produce an outcome that makes even less sense.

Duguid's reliance on the distributive canon fails for similar reasons. That canon provides that "[w]here a sentence contains several antecedents and several consequents," courts should "read them distributively and apply the words to the subjects which, by context, they seem most properly to relate." 2A Singer, Sutherland Statutes and Statutory Construction §47:26, at 448. Set aside for a moment that the canon's relevance is highly questionable given there are two antecedents (store and produce) but only one consequent modifier (using a random or sequential

––––––––––

[7] Duguid argues that such a device would necessarily "produce" numbers using the same generator technology, meaning "store or" in §227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 544, n. 7 (1994). For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time. See Brief for Professional Association for Customer Engagement et al. as *Amici Curiae* 19. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute. *Atlantic Richfield Co.* v. *Christian*, 590 U. S. ___, ___, n. 5 (2020) (slip op., at 10, n. 5).

number generator). See *Encino Motorcars*, 584 U. S., at \_\_\_ (slip op., at 8) ("[T]he distributive canon has the most force when the statute allows for one-to-one matching"). As just explained, the consequent "using a random or sequential number generator" properly relates to both antecedents.

Duguid next turns to legislative purpose, but he merely gestures at Congress' "broad privacy-protection goals." Brief for Respondents 28 (emphasizing that Congress prohibited calls made using an autodialer without "'prior express consent of the called party'" (quoting 47 U. S. C. §227(b)(1)(A))). That Congress was broadly concerned about intrusive telemarketing practices, however, does not mean it adopted a broad autodialer definition. Congress expressly found that the use of random or sequential number generator technology caused unique problems for business, emergency, and cellular lines. See *supra,* at 2. Unsurprisingly, then, the autodialer definition Congress employed includes only devices that use such technology, and the autodialer prohibitions target calls made to such lines. See §227(b)(1)(A).[8] The narrow statutory design, therefore, does not support Duguid's broad interpretation.

Duguid last warns that accepting Facebook's interpretation will "unleash" a "torrent of robocalls." Brief for Respondents 38 (quotation modified). As Duguid sees it, the thrust of congressional action since the TCPA's enactment has been to restrict nuisance calls. Because technology "adapt[s] to change," Duguid argues, the TCPA must be treated as an "'agile tool.'" *Id.,* at 38, 41. To this end, Duguid asks this Court to focus not on whether a device has the "senescent technology," *id.,* at 41, of random or sequential number generation but instead on whether it has the "capacity to dial numbers without human intervention," *id.,*

———————
[8] By contrast, Congress did impose broader prohibitions elsewhere in the TCPA. See, *e.g.,* 47 U. S. C. §§227(b)(1)(A) and (B) (prohibiting "artificial or prerecorded voice" calls, irrespective of the type of technology used).

at 39 (internal quotation marks omitted).

To begin with, Duguid greatly overstates the effects of accepting Facebook's interpretation. The statute separately prohibits calls using "an artificial or prerecorded voice" to various types of phone lines, including home phones and cell phones, unless an exception applies. See 47 U. S. C. §§227(b)(1)(A) and (B). Our decision does not affect that prohibition. In any event, Duguid's quarrel is with Congress, which did not define an autodialer as malleably as he would have liked. "Senescent" as a number generator (and perhaps the TCPA itself) may be, that is no justification for eschewing the best reading of §227(a)(1)(A). This Court must interpret what Congress wrote, which is that "using a random or sequential number generator" modifies both "store" and "produce."

\*　　　\*　　　\*

We hold that a necessary feature of an autodialer under §227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–511

_____

## FACEBOOK, INC., PETITIONER *v.*
## NOAH DUGUID, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 1, 2021]

JUSTICE ALITO, concurring in the judgment.

I agree with the Court that an "automatic telephone dialing system," as defined in the Telephone Consumer Protection Act of 1991, must have the capacity to "store . . . telephone numbers" by "using a random or sequential number generator." 47 U. S. C. §227(a)(1)(A). I also agree with much of the Court's analysis and the analysis in several Court of Appeals decisions on this question. See *Gadelhak* v. *AT&T Servs., Inc.*, 950 F. 3d 458, 463–468 (CA7 2020); *Glasser* v. *Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1306–1312 (CA11 2020).

I write separately to address the Court's heavy reliance on one of the canons of interpretation that have come to play a prominent role in our statutory interpretation cases. Cataloged in a treatise written by our former colleague Antonin Scalia and Bryan A. Garner, counsel for respondents in this case, these canons are useful tools, but it is important to keep their limitations in mind. This may be especially true with respect to the particular canon at issue here, the "series-qualifier" canon.

According to the majority's recitation of this canon, "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Ante*, at 5 (quoting A. Scalia & B. Garner, Reading Law: The

Interpretation of Legal Texts 147 (2012) (Reading Law)).*

The Court refers to this canon as a "rul[e] of grammar." *Ante,* at 5. Yet the Scalia-Garner treatise makes it clear that interpretive canons "are not 'rules' of interpretation in any strict sense but presumptions about what an intelligently produced text conveys." Reading Law 51. (Even grammar, according to Mr. Garner, is ordinarily just "an attempt to describe the English language as it is actually used." B. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 1 (2016)). And Reading Law goes out of its way to emphasize the limitations of the series-qualifier canon, warning:

> "Perhaps more than most of the other canons, [the series-qualifier canon] is highly sensitive to context. Often the sense of the matter prevails: *He went forth and wept bitterly* does not suggest that he went forth bitterly." Reading Law 150.

The italicized sentence—an English translation of a sentence in the New Testament, Matthew 26:75—is not only grammatical; it is perfectly clear. No one familiar with the English language would fail to understand it—even though its meaning is contrary to the one suggested by the series-qualifier canon.

The Court writes that the series-qualifier canon "generally reflects the most natural reading of a sentence," *ante*, at 5, and *maybe* that is so. But cf. *Lockhart* v. *United States*, 577 U. S. 347, 351 (2016) (relying on "the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it").

—————

*As set out in Reading Law 147, this canon also applies when the modifier precedes the series of verbs or nouns.

Some scholars have claimed that "nobody proposed [the series-qualifier] canon until Justice Scalia pioneered it" in Reading Law. Baude & Sachs, The Law of Interpretation, 130 Harv. L. Rev. 1079, 1125 (2017) (internal quotation marks omitted; emphasis deleted).

But it is very easy to think of sentences that clearly go against the canon:

> "At the Super Bowl party, she ate, drank, and cheered raucously."
> "On Saturday, he relaxes and exercises vigorously."
> "When his owner comes home, the dog wags his tail and barks loudly."
> "It is illegal to hunt rhinos and giraffes with necks longer than three feet."
> "She likes to swim and run wearing track spikes."

In support of its treatment of the series-qualifier canon, the Court offers this example of a sentence in which the natural reading corresponds with the interpretation suggested by the canon: "[S]tudents must not complete or check any homework to be turned in for a grade, using online homework-help websites." *Ante*, at 5. I certainly agree that the adverbial phrase in this sentence ("using online homework-help websites") modifies both of the verbs it follows ("complete" and "check") and not just the latter. But that understanding has little to do with syntax and everything to do with our common understanding that teachers do not want to prohibit students from doing homework. We can see this point clearly if we retain the same syntax but replace the verb "complete" with any number of other verbs that describe something a teacher is not likely to want students to do, say, "ignore," "overlook," "discard," "lose," "neglect," "forget," "destroy," "throw away," or "incinerate" their homework. The concept of "using online homework-help websites" to do any of those things would be nonsensical, and no reader would interpret the sentence to have that meaning—even though that is what the series-qualifier canon suggests.

The strength and validity of an interpretive canon is an empirical question, and perhaps someday it will be possible

to evaluate these canons by conducting what is called a corpus linguistics analysis, that is, an analysis of how particular combinations of words are used in a vast database of English prose. See generally Lee & Mouritsen, Judging Ordinary Meaning, 127 Yale L. J. 788 (2018). If the series-qualifier canon were analyzed in this way, I suspect we would find that series qualifiers sometimes modify all the nouns or verbs in a list and sometimes modify just the last noun or verb. It would be interesting to see if the percentage of sentences in the first category is high enough to justify the canon. But no matter how the sentences with the relevant structure broke down, it would be surprising if "the sense of the matter" did not readily reveal the meaning in the great majority of cases. Reading Law 150.

That is just my guess. Empirical evidence might prove me wrong, but that is not what matters. The important point is that interpretive canons attempt to identify the way in which "a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Id.,* at 33. To the extent that interpretive canons accurately describe how the English language is generally used, they are useful tools. But they are not inflexible rules.

Appellate judges spend virtually every working hour speaking, listening to, reading, or writing English prose. Statutes are written in English prose, and interpretation is not a technical exercise to be carried out by mechanically applying a set of arcane rules. Canons of interpretation can help in figuring out the meaning of troublesome statutory language, but if they are treated like rigid rules, they can lead us astray. When this Court describes canons as rules or quotes canons while omitting their caveats and limitations, we only encourage the lower courts to relegate statutory interpretation to a series of if-then computations. No reasonable reader interprets texts that way.

For these reasons, I respectfully concur in the judgment.